## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

JEREMIAH CHESNEY,

      Plaintiff,                        Case No. 14-11097

v.                                      Hon. Gerald E. Rosen

CITY OF JACKSON, POLICE SERGEANT
PAUL GROSS, POLICE OFFICER TIMOTHY
BLACK, POLICE OFFICER WILLIAM
MILLS, POLICE OFFICER PETER POSTMA,
POLICE OFFICER CARY KINGSTON, and
MATTHEW R. HEINS,

      Defendants.
_____/

## OPINION AND ORDER GRANTING
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on _____March 21, 2016_____

PRESENT:  Honorable Gerald E. Rosen
United States District Judge

## I.  INTRODUCTION

Plaintiff Jeremiah Chesney commenced this action in this Court on March

13, 2014, asserting federal civil rights claims and a variety of state-law claims

against the Defendant City of Jackson, Michigan, five Jackson police officers —

Sergeant Paul Gross and Police Officers Timothy Black, William Mills, Peter Postma, and Cary Kingston — and the City of Jackson's director of police and fire services, Matthew R. Heins.[1]  Plaintiff's claims arise from a May 15, 2013 incident in which four of the Defendant law enforcement officers forcibly removed Plaintiff from a Michigan Secretary of State office and arrested him following a report to the Jackson police department that an individual in the office had a gun in a backpack and was acting suspiciously.  This Court's subject matter jurisdiction rests upon Plaintiff's assertion of claims under 42 U.S.C. § 1983 alleging violations of his rights under the U.S. Constitution.  *See* 28 U.S.C. § 1331.

Through the present motion filed on December 1, 2014, the individual Defendant law enforcement officers and the Defendant City of Jackson seek an award of summary judgment in their favor on each of the claims asserted against them in Plaintiff's complaint.  In support of this motion, Defendants argue primarily (i) that Plaintiff has failed to identify expressive activity that could support his claim that he was detained and arrested in retaliation against his exercise of protected First Amendment rights; (ii) that Plaintiff's claim under the

---

[1]Plaintiff's complaint names the County of Jackson, Michigan as an additional defendant, but this party was dismissed in a stipulated order dated April 8, 2014.

2

Second Amendment fails due to the lack of clearly established law that could have alerted the Defendant police officers to their alleged violation of Plaintiff's rights under this Amendment; (iii) that Plaintiff has failed to produce evidence of an unreasonable seizure or unlawful arrest that could sustain his federal Fourth Amendment claims or his state-law claims of assault and battery and false imprisonment; and (iv) that certain of Plaintiff's state-law claims are barred by the immunity conferred upon municipalities and their employees.[2]  In response, Plaintiff contends (i) that his open carrying of a firearm in a place where he was lawfully allowed to do so qualifies as expressive activity protected under the First Amendment; (ii) that the Defendant police officers likewise transgressed upon a claimed Second Amendment right to bear arms outside the home; (iii) that the Defendant officers lacked reasonable suspicion to detain him and forcibly remove him from the Secretary of State office, nor did they have probable cause to arrest him following this removal; and (iv) that the same evidence supporting Plaintiff's

_____

[2]Defendants raise other arguments in their motion that Plaintiff does not oppose. First, Plaintiff concedes that his federal claims against the City of Jackson are subject to dismissal, either as incompatible with existing law or as lacking in evidentiary support. Next, Plaintiff acknowledges that he has not pled a separate claim for relief under the Fourteenth Amendment to the U.S. Constitution.  Finally, Defendant contends that Plaintiff's claim of conspiracy is barred by the intracorporate conspiracy doctrine, *see Jackson v. City of Columbus,* 194 F.3d 737, 753 (6th Cir. 1999), and Plaintiff evidently has abandoned his conspiracy claim by failing to address this argument — or, indeed, to even mention this claim — in his response to Defendants' motion.

federal Fourth Amendment claims also permits him to go forward with his state-law claims of assault and battery and false imprisonment.

Defendants' motion has been fully briefed by the parties. Having reviewed the parties' briefs and their accompanying exhibits, as well as the remainder of the record, the Court finds that the relevant allegations, facts, and legal issues are sufficiently presented in these written submissions, and that oral argument would not aid the decisional process. Accordingly, the Court will decide Defendants' motion "on the briefs." *See* Local Rule 7.1(f)(2), U.S. District Court, Eastern District of Michigan. This opinion and order sets forth the Court's rulings on this motion.

## II. FACTUAL BACKGROUND

The pertinent facts of this case are derived almost exclusively from the deposition testimony of Plaintiff Jeremiah Chesney.[3] At around 5:00 p.m. on May 15, 2013, Plaintiff went to the Michigan Secretary of State branch office located in the Jackson Crossing mall in Jackson, Michigan, seeking to obtain a new title for one of his motorcycles. As he entered the office, Plaintiff was carrying a loaded

---

[3]Notably, there is no indication in the record that any of the Defendant law enforcement officers were deposed. Rather, apart from Plaintiff's own deposition, the police reports prepared by the Defendant officers provide the sole account of the events giving rise to this litigation, and Plaintiff and Defendants alike cite to and rely on these police reports in their summary judgment briefing.

pistol in a holster on his hip,[4] but he initially had no other items in his possession. After waiting for about 20 minutes, Plaintiff went back to his car and returned to the Secretary of State office with a black backpack and a lunchbox.[5]  Plaintiff estimated that there were "probably 50 to 60 people" in the office at the time. (Plaintiff's Dep. at 50.)

Upon re-entering the Secretary of State office with his backpack, Plaintiff initially sat at a desk, but then got up and walked around, leaving his backpack and lunchbox at the desk.  (*See id.* at 50, 52-53.)  As he waited, nobody asked him about the fact that he was carrying a weapon, nor did he hear or observe anyone express any concern about this, but he did overhear "[i]ndistinct whispering" at one point that apparently included "the word 'gun.'"  (*Id.* at 51.)

During this time, someone in the office — evidently a Secretary of State employee, although the record is not entirely clear on this point — called the City

---

[4]Defendants note that a "Code of Conduct" posted inside the Jackson Crossing mall prohibits the carrying or display of firearms except by law enforcement officers. (*See* Defendants' Motion, Ex. 2.)  Plaintiff evidently would not have seen this sign as he entered the Secretary of State office, however, because he came in through an outside entrance rather than the mall entrance to the office.  Moreover, Defendants do not contend that Plaintiff violated Michigan law by openly carrying a firearm in a Secretary of State office.

[5]Plaintiff explained that he "didn't feel comfortable leaving my book bag in the car with my computer inside," so he decided to bring it into the office.  (Defendants' Motion, Ex. 1, Plaintiff's Dep. at 48.)

5

of Jackson police department to report that "a subject with long hair was possibly in possession of a handgun in a backpack, while at the Secretary of State Office." (Defendants' Motion, Ex. 3, Police Report at 2.)[6]  Four of the Defendant police officers — Sergeant Paul Gross and Police Officers Timothy Black, William Mills, and Cary Kingston — were dispatched to the Secretary of State office to investigate this report.  As they traveled to the scene, the officers were advised that the office "was a No Weapon Zone and that there were signs posted, stating this."  (*Id.* at 2; *see also id.* at 4 (Officer Mills likewise reporting that the dispatcher "advised that the Secretary of State Office was a weapons-free zone").)[7] The officers were further advised that "the subject was pacing back and forth," leading the individual who had called the police to be "nervous that something

---

[6]This account of the call was given by one of the Defendant police officers, Timothy Black.  Another Defendant officer, William Mills, reported that he was advised by a dispatcher that "there was a subject that had a loaded handgun inside the Secretary of State," and that this individual was a "white male with long dark hair, carrying a backpack."  (*Id.* at 4.)  Finally, a third Defendant officer, Sergeant Paul Gross, stated that a dispatcher advised him "that there was a subject inside Jackson Crossing's Secretary of State Office who was in possession of a handgun, which was believed to be inside a backpack."  (*Id.* at 7.)

[7]As noted earlier, any such signs declaring a "weapons-free zone" were posted in the Jackson Crossing mall, and not in the Secretary of State office, and Defendants evidently do not contend that the branch office itself was a gun-free zone.

6

2:14-cv-11097-GER-MJH   Doc # 23   Filed 03/21/16   Pg 7 of 60   Pg ID 278

else was going on." (*Id.* at 4.)[8] Sergeant Gross sought clarification from the dispatcher whether the subject's gun was "inside [his] backpack or on the outside of the backpack, exposed in an open-carry fashion," but he arrived at the scene without receiving a response to this inquiry. (*Id.* at 7.)

Upon the officers' arrival at the Secretary of State office, Officers Black and Kingston proceeded into the Jackson Crossing mall and headed toward the mall entrance to the office, while Officer Mills went to the office's outside entrance. As Officer Black stood in the mall and looked through a window into the Secretary of State office, attempting to locate the subject of the officers' investigation, he asked "three or four" Secretary of State employees who had stepped outside the office "where the backpack was or if [the subject] had a backpack and where was the gun," but he received only "shrugs of shoulders and no answers." (*Id.* at 2.) Officer Black then observed a white male with long hair standing against the wall near the outside entrance to the office, but this individual did not appear to have a backpack. Another Secretary of State employee exited the office and pointed at this same individual, advising Officer Black that he had a gun on his hip, but the officer was unable to confirm this "[d]ue to the 50 to 60"

---

[8]Defendants point out that this incident took place on May 15, 2013, the one-month anniversary of the Boston Marathon bombings, which involved backpacks containing home-made bombs.

occupants of the office at the time and the pillars in the office that obstructed his view. (*Id.* at 3.) Accordingly, Officer Black entered the office in order to get a better view of this individual, and upon observing that this man had "what appeared to be a black and silver handgun, being an automatic pistol, on his right waist area," he motioned for Officer Mills to come into the office through the outside entrance, near where this individual was standing. (*Id.*)

Officer Mills then entered the Secretary of State office at Officer Black's direction, observing that there were "50-plus" people in the office, including small children and elderly individuals. (*Id.* at 4.) The officer approached the subject of the investigation, who he immediately recognized "from a prior contact" as Plaintiff Jeremiah Chesney,[9] and noticed that Plaintiff "was carrying a pistol in a holster on his right side." (Police Report at 4.) Officer Mills then asked Plaintiff "just to step outside, so we could talk to him about what was going on," (*id.*), but Plaintiff responded that he "did not desire to step outside" and instead "was willing to talk with [the officer] where we were," (Plaintiff's Dep. at 60).[10]

_____

[9]Plaintiff likewise testified that he recognized Officer Mills from a previous interaction with this officer. (Plaintiff's Dep. at 57.)

[10]Plaintiff explained at his deposition that he had been waiting at the Secretary of State office for roughly an hour when the officers arrived, so he "didn't exactly feel like leaving" the office at that point and "losing [his] position" in line. (*Id.* at 50, 60.)

8

Plaintiff testified at his deposition that "[t]he next thing I remember after stating that I did not wish to go outside is the four officers surrounding me, grabbing me, and forcing me outside." (*Id.* at 61.) Officer Mills, in contrast, stated in his police report (i) that he asked Plaintiff "politely a second time to just step outside, so we could talk about what was going on," (ii) that Plaintiff again "refused to do so, stating very firmly that he would not go outside, that he was staying inside the mall[,] and that I had no right to demand him or force him to go outside," (iii) that Plaintiff was "very agitated" when asked to step outside and "raised his voice in a manner that made me believe that he was being very confrontational with me," and (iv) that during the course of this interaction, Plaintiff's "behavior began to escalate even further and made me even more concerned for the safety of the other [occupants] inside the Secretary of State Office, that some type of confrontation would erupt[,] and I did not want that to occur to cause injuries or loss of life inside the Secretary of State Office." (Police Report at 4.)[11] Accordingly, Officer Mills stated in his report that he and Sergeant

_____

[11]Plaintiff acknowledged at his deposition that it was "entirely possible" that Officer Mills, or perhaps another officer, repeated the request that he step outside the office before the officers forced him out the door, and he agreed that he refused each such request and generally was non-compliant with the officers' appeals for him to accompany them out of the office. (Plaintiff's Dep. at 61-63, 75.) Plaintiff further testified that it was "possible" that he raised his voice during this interaction, though he stated that he did so "in order to be heard," and that Officer Mills likewise raised his voice in repeating his

9

Gross each grabbed one of Plaintiff's arms and escorted him out the door of the office, and that Plaintiff responded by "tens[ing] up," "pulling away," and insisting in a "very loud" voice that the officers let him go and that they "had no right to do what [they] were doing." (Police Report at 5.)[12]  Officer Mills advised Plaintiff "to relax, that we were going to go outside," and Officer Black removed the pistol from Plaintiff's holster as Sergeant Gross and Officer Mills escorted Plaintiff from the premises. (*Id.* at 5.)[13]  Plaintiff testified that he "did not attempt to physically resist leaving [the office] once [the officers] laid their hands on me," but he acknowledged that he tensed his arms and struggled with the officers as they led him out of the office. (Plaintiff's Dep. at 67.)

_____

request that Plaintiff step outside. (*Id.* at 62-63.)  Plaintiff denied, however, that he became confrontational, combative, agitated, annoyed, or upset during this initial interaction with Officer Mills. (*See id.* at 62, 75.)

[12]Officer Black likewise stated in his report that as Sergeant Gross and Officer Mills grabbed Plaintiff's arms and led him out of the building, Plaintiff "straightened his arms out and attempted to resist and continued to scream and yell about his rights." (*Id.* at 3.)  Similarly, Sergeant Gross's report states that Plaintiff "immediately tensed up and refused to be escorted" as he and Officer Mills attempted to lead him out of the office, so that it was necessary to "forcibly remov[e]" him from the premises. (*Id.* at 8.)

[13]Sergeant Gross explained in his report that Officer Black was instructed to disarm Plaintiff as he was taken from the office in light of Plaintiff's "failure to comply with Officer Mill[s]'[] commands and directives, in addition to his escalating defiant and unpredictable behavior," leading Sergeant Gross to conclude that "there was no resolution in efforts to speak with [Plaintiff] or with getting him to cooperate with this investigation, while also maintaining the safety of the 50 to 60 men, women and children that were sitting nearby." (*Id.* at 8.)

Once Plaintiff was taken from the Secretary of State office, Sergeant Gross asked for his identification, but Plaintiff "ignored" this request and instead expressed "confus[ion] as to why I had been forcibly removed" and "demanded to know why I was assaulted, why I was attacked." (*Id.* at 69-70.) Sergeant Gross advised Plaintiff that the officers were investigating a report of a gun in a backpack, and Plaintiff stated in response "that there was no need for me to identify myself or to disclose that I was carrying a pistol because I was not carrying it concealed." (*Id.* at 70-71.) Plaintiff further insisted that "at no point was my gun in my bag," and that any caller to the police who claimed otherwise had made a false report. (*Id.* at 71.)[14]

After Plaintiff repeatedly refused to provide any identification, one of the Defendant officers took his driver's license from him. (Plaintiff's Dep. at 69-70, 72-73.) In addition, after "several minutes of discussion," Plaintiff gave Sergeant Gross his license to carry a concealed weapon. (*Id.* at 73.) In the meantime,

---

[14]Similarly, Sergeant Gross stated in his report that Plaintiff refused to produce a license authorizing him to carry a concealed weapon, even after being advised that the officers were investigating a report of a gun in a backpack. (Police Report at 8.) Rather, Plaintiff told Sergeant Gross that he was not carrying a concealed weapon and he "question[ed] the caller's information" to the contrary. (*Id.*) Sergeant Gross described Plaintiff as "extremely defiant," "confrontational," and "uncooperative" during this interview, refusing to provide such information as "his phone number, where he lived and where he worked," "recit[ing] certain federal, state and city . . . laws" that he believed the officers had violated, and indicating "that he did nothing wrong and that he was protected by federal laws for carrying [his] weapon." (*Id.*)

Plaintiff's backpack and lunchbox were retrieved from the Secretary of State

office and placed on the hood of Officer Mills' patrol car. (Police Report at 5.)[15]

In addition, Officer Mills conducted a records check of Plaintiff and determined

that he had a valid license to carry a concealed weapon, that he had no outstanding

warrants, and that the gun that had been taken from him was legally registered to

him. (*Id.*)

Following a discussion between Sergeant Gross and Officer Mills, it was

determined that Plaintiff would be arrested on a charge of resisting and obstructing

a police officer, in light of his refusal to leave the Secretary of State office despite

the officers' several requests that he do so. (*See id.* at 5, 9.) Accordingly, Plaintiff

was informed that he was under arrest and was ordered to put his hands behind his

back, but he testified that he was not "initially compliant" with this directive, and

instead "sought clarification" as to "why I was under arrest." (Plaintiff's Dep. at

75-76.) Sergeant Gross and Officer Mills stated in their reports that as they

attempted to place Plaintiff in handcuffs, he "began tensing up and refused to put

his hands behind his back," leading Sergeant Gross and Officers Mills and

Kingston to "forcibly put [Plaintiff's] hands behind his back" so that he could be

---

[15]The record does not disclose whether these items were searched or, if so, what
was found in them. There is no claim that any sort of weapon was found in Plaintiff's
backpack.

handcuffed.  (Police Report at 9; *see also id.* at 5-6.)  Officer Mills further stated that he "grabbed [Plaintiff's] extremely long hair" and "pull[ed] his head backward" to obtain his compliance with the officers' effort to handcuff him, advising Plaintiff that "once he was handcuffed, I would allow his hair to be let go."  (*Id.* at 6.)

After he was secured in handcuffs, Plaintiff was placed in the back of Officer Mills' patrol car and transported to the Jackson County jail.  (*See id.* at 6, 9.)  Plaintiff apparently was held in jail for two days until his arraignment, and the charge against him ultimately was dismissed at the prosecutor's discretion.  This suit followed in March of 2014, with Plaintiff asserting federal claims under 42 U.S.C. § 1983 alleging violations of his rights under the First, Second, and Fourth Amendments to the U.S. Constitution, and also asserting state-law claims of assault and battery, false imprisonment, and replevin.[16]

### III.  ANALYSIS

**A.     The Standards Governing Defendants' Motion**

-----

[16]As noted earlier, to the extent that Plaintiff's complaint could be construed as asserting a separate federal § 1983 claim resting on the protections and guarantees of the Fourteenth Amendment, Plaintiff has clarified in his response to Defendants' present motion that he is not pursuing any such claim.  In addition, it is evident from the parties' summary judgment briefing that Plaintiff has abandoned the conspiracy claim asserted in Count VI of his complaint.

Through the present motion, the five individual Defendant law enforcement officers and the Defendant City of Jackson seek an award of summary judgment in their favor on Plaintiff's federal civil rights claims under 42 U.S.C. § 1983 and his state-law claims of assault and battery, false imprisonment, and replevin. Under the Federal Rule governing Defendants' motion, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). As the Supreme Court has explained, "the plain language of Rule 56[] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).

In deciding a motion brought under Rule 56, the Court must view the evidence "in a light most favorable to the party opposing the motion, giving that party the benefit of all reasonable inferences." *Smith Wholesale Co. v. R.J. Reynolds Tobacco Co.,* 477 F.3d 854, 861 (6th Cir. 2007). Yet, the nonmoving party may not rely on bare allegations or denials, but instead must support a claim of disputed facts by "citing to particular parts of materials in the record, including

14

depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). Moreover, any supporting or opposing affidavits "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). Finally, "[a] mere scintilla of evidence is insufficient" to withstand a summary judgment motion; rather, "there must be evidence on which the jury could reasonably find for the non-moving party." *Smith Wholesale,* 477 F.3d at 861 (internal quotation marks and citation omitted).

## B.    The Defendant Law Enforcement Officers Are Entitled to Qualified Immunity from Liability for Plaintiff's Federal Claims Under 42 U.S.C. § 1983.

### 1.    The Standards Governing the Defendant Officers' Appeal to the Doctrine of Qualified Immunity

In counts I through III of his complaint, Plaintiff alleges that the individual Defendant law enforcement officers violated his rights under the First, Second, and Fourth Amendments to the U.S. Constitution.[17] In seeking an award of

---

[17]Plaintiff further alleges in his complaint that the Defendant City of Jackson and Defendant Matthew R. Heins, the City's director of police and fire services, are subject to liability for these alleged violations of his federal constitutional rights by virtue of having adopted policies, ratified the actions of the Defendant police officers, or failed to train the

15

summary judgment in their favor on these claims, the Defendant officers invoke the doctrine of qualified immunity as affording them protection from liability for any of the federal constitutional violations alleged by Plaintiff.  Under this doctrine, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982).  Qualified immunity is an affirmative defense and a defendant government official has the threshold burden to plead it, "but the plaintiff bears the burden of showing that the defendant's conduct violated a right so clearly established that a reasonable official in [the defendant's] position would have clearly understood that he or she was under an affirmative duty to refrain from such conduct." *Sheets v. Mullins,* 287 F.3d 581, 586 (6th Cir. 2002).  "The ultimate burden of proof is on the plaintiff to show that the defendant is not entitled to qualified immunity." *Sheets,* 287 F.3d at 586.

Application of the doctrine of qualified immunity entails two inquiries.

---

officers, such that they can be said to have caused the alleged constitutional violations.  In his response to Defendants' motion, however, Plaintiff concedes that he has failed to uncover evidence in support of his federal claims of municipal liability.  Thus, the Court need only address Plaintiff's federal § 1983 claims against the five individual Defendant law enforcement officers named in the complaint.

16

"First, the court must determine whether, based upon the applicable law, the facts viewed in the light most favorable to the plaintiff[] show that a constitutional violation has occurred." *Burchett v. Kiefer,* 310 F.3d 937, 942 (6th Cir. 2002). Next, "[i]f the court finds a constitutional violation, it must then consider whether the violation involves clearly established constitutional rights of which a reasonable person would have known." *Burchett,* 310 F.3d at 942. The two steps of this qualified immunity inquiry need not be rigidly performed in the same sequence in each and every case; rather, the Supreme Court has explained that judges "should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand." *Pearson v. Callahan,* 555 U.S. 223, 236, 129 S. Ct. 808, 818 (2009).

The Supreme Court has emphasized that the doctrine of qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments about open legal questions," and "protects all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al-Kidd,* 563 U.S. 731, ___, 131 S. Ct. 2074, 2085 (2011) (internal quotation marks and citation omitted). Thus, in determining whether a government official has violated a "clearly established" constitutional right under the second prong of the qualified

17

immunity standard, a court must inquire whether "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S. Ct. 3034, 3039 (1987). "We do not require a case directly on point, but existing precedent must have placed the . . . constitutional question beyond debate." *al-Kidd,* 563 U.S. at ___, 131 S. Ct. at 2083. Moreover, "[b]ecause the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct." *Brosseau v. Haugen,* 543 U.S. 194, 198, 125 S. Ct. 596, 599 (2004).

According to the Sixth Circuit, "[a] right is not considered clearly established unless it has been authoritatively decided by the United States Supreme Court, the Court of Appeals, or the highest court of the state in which the alleged constitutional violation occurred." *Durham v. Nu'Man,* 97 F.3d 862, 866 (6th Cir. 1996). Along the same lines, the Supreme Court has emphasized that "absent controlling authority," a right may be deemed clearly established only through "a robust consensus of cases of persuasive authority." *al-Kidd,* 563 U.S. at ___, 131 S. Ct. at 2084 (internal quotation marks and citation omitted). Finally, the inquiry into clearly established rights "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Brosseau,* 543

U.S. at 198, 125 S. Ct. at 599 (internal quotation marks and citation omitted).

### 2.     Plaintiff's First Amendment Claims of Retaliatory Seizure and Arrest

Against this backdrop, the Court turns first to Plaintiff's claim that the Defendant police officers violated his protected First Amendment right of free speech by seizing and arresting him in retaliation against his expressive "act of openly carrying a pistol in public," an act that was "intended, in part, to increase awareness that open carry is lawful in Michigan and to rally public support" for this lawful activity.  (Complaint at ¶ 49.)  Defendants seek summary judgment in their favor on this claim, arguing (i) that Plaintiff's act of openly carrying a gun in a Secretary of State office does not qualify as protected free speech under the First Amendment, and (ii) that there is no evidence that the actions taken by the Defendant officers were motivated by Plaintiff's alleged exercise of his right to free speech.  The Court agrees on both scores.

As the Supreme Court has explained, although "[t]he First Amendment literally forbids the abridgment only of 'speech,'" conduct that is "sufficiently imbued with elements of communication [may] fall within the scope of the First and Fourteenth Amendments."  *Texas v. Johnson,* 491 U.S. 397, 404, 109 S. Ct. 2533, 2539 (1989) (internal quotation marks and citation omitted).  In particular,

19

conduct is eligible for First Amendment protection where (i) there is an "intent to convey a particularized message," and (ii) the surrounding circumstances give rise to a great "likelihood . . . that the message would be understood by those who viewed it." *Spence v. Washington,* 418 U.S. 405, 410-11, 94 S. Ct. 2727, 2730 (1974). The record here fails as a matter of law to establish either of these elements of a First Amendment claim arising from Plaintiff's conduct in the Secretary of State office.

First, while Plaintiff maintains in his response to Defendants' motion that he was openly carrying a firearm at the Secretary of State office "in order to promote awareness of and educate others, including law enforcement, on the legality of open carry," (Plaintiff's Response Br. at 16), he cites nothing in the record to support this bare assertion by his counsel. Rather, Plaintiff testified that he went to the Secretary of State office "to get a new title" for his motorcycle, (Plaintiff's Dep. at 53), and at no point in his deposition testimony did he refer to the educational mission claimed in his summary judgment briefing and alleged in his complaint. More generally, Plaintiff testified that he had openly carried a firearm without incident in prior trips to the Jackson Crossing mall, and that he routinely carries a gun whenever he can legally do so, (*see id.* at 50, 90), suggesting that Plaintiff did not view his visit to the Secretary of State office as an especially

20

noteworthy occasion for promoting awareness of Michigan's open carry law.

Even assuming there was evidence that Plaintiff acted with the requisite intent to convey a particularized message, the circumstances surrounding Plaintiff's visit to the Secretary of State office do not give rise to a significant likelihood that this message would be understood by others in the office. First, Plaintiff was not carrying a sign, wearing a message on his clothing, handing out leaflets, or engaging in any other activity that could have clarified or lent additional support to his alleged advocacy for the right to openly carry a firearm. Nor did Plaintiff interact with anyone else in the Secretary of State office in an effort to draw attention to his purported message that Michigan law permits the open carrying of guns. Rather, Defendants aptly observe that Plaintiff was "simply wearing his gun in an open manner," (Defendants' Motion, Br. in Support at 8), evidently relying on this conduct alone to convey his desired message. As Defendants point out, courts in this and other circuits have held that gun possession alone is unlikely to convey a particular message that would be understood by those who witnessed it. *See, e.g., Deffert v. Moe,* 111 F. Supp.3d 797, 814 (W.D. Mich. 2015); *Northrup v. City of Toledo Police Division,* 58 F. Supp.3d 842, 848 (N.D. Ohio 2014), *rev'd in part on other grounds,* 785 F.3d 1128 (6th Cir. 2015); *Baker v. Schwarb,* 40 F. Supp.3d 881, 895 (E.D. Mich.

21

2:14-cv-11097-GER-MJH   Doc # 23   Filed 03/21/16   Pg 22 of 60   Pg ID 293

2014); *Nordyke v. King,* 319 F.3d 1185, 1190 (9th Cir. 2003); *Burgess v.*

*Wallingford,* No. 11-cv-1129, 2013 WL 4494481, at *9 (D. Conn. May 15, 2013),

*aff'd,* 569 F. App'x 21 (2d Cir. June 12, 2014).[18]

---

[18]In light of these rulings, even if the Court were to determine that Plaintiff's open carrying of a firearm in this case was eligible for First Amendment protection as expressive conduct, it could not be said that the Defendant officers' alleged transgression of this right violated clearly established law. Rather, the only case cited by Plaintiff as lending support to his claim of expressive conduct, *Smith v. Tarrant County College District,* 694 F. Supp.2d 610 (N.D. Tex. 2010), is readily distinguishable, and this district court decision from another circuit could not be said, in any event, to inform the understanding of the Defendant police officers as to the prevailing First Amendment standards in their jurisdiction.

In *Smith,* 694 F. Supp.2d at 613, the plaintiff students were "members of Students for Concealed Carry on Campus ('SCCC'), a national organization created in the wake of the shootings at Virginia Tech" that sought to persuade college officials to "allow students who are licensed to carry a concealed firearm to do so on college campuses." As part of the SCCC's advocacy, the plaintiff students wished to engage in "empty-holster protests," in which they would "wear empty holsters during their normal campus activities to symbolize the fact that they [we]re unarmed and potentially defenseless against a gunman such as the one at Virginia Tech." 694 F. Supp.2d at 613. The students also "planned to wear . . a  t-shirt bearing the SCCC logo — a mortarboard atop a revolver — and hand out leaflets detailing SCCC's viewpoints in between classes." 694 F. Supp.2d at 613.

Importantly, the court in *Smith* did not consider, much less rule upon, the question whether the "empty-holster" protest qualified as expressive activity. Rather, the court and the parties alike evidently assumed that each of the advocacy efforts planned by the plaintiff SCCC members — including their wearing of empty holsters and SCCC T-shirts and their distribution of leaflets — were eligible for First Amendment protection, and the pertinent question before the court was whether the defendant college had identified sufficient grounds for limiting these activities to a campus "free-speech" zone rather the school's classrooms and adjacent hallways. *See Smith,* 694 F. Supp.2d at 624-32. The court found that the college's appeal to a "disruptive activities" provision in its student handbook did not provide a sufficient basis for prohibiting the plaintiff students from wearing empty holsters in classrooms, where the concern that this protest might be

22

Moreover, the record lacks evidence that anyone at the Secretary of State

office actually perceived the message that Plaintiff purportedly sought to convey.

Plaintiff testified that before the police arrived, nobody asked him about the fact

that he was carrying a gun or expressed concern that he was doing so, and that he

heard only "[i]ndistinct whispering" that seemed to include "something about the

word 'gun.'"  (Plaintiff's Dep. at 51.)  In addition, the caller to the Jackson police

department evidently reported that an individual in the Secretary of State office

"was in possession of a handgun, which was believed to be inside a backpack,"

(Police Report at 7; *see also id.* at 2 (stating that a dispatcher advised Officer

_____

disruptive rested solely on "the speculation of [college] officials."  694 F. Supp.2d at 628-
32.

Even if *Smith* were a decision from within this circuit, it could not be said to have
clearly established that Plaintiff's open carrying of a firearm was entitled to First
Amendment protection as expressive conduct.  As explained, *Smith* did not even consider
what sorts of activities might count as speech under the First Amendment, but instead
accepted as a given that the "empty holster" protest at issue in that case was a form of
symbolic speech.  Indeed, because an empty holster by itself serves no apparent purpose,
this activity carries an inherent message that is not replicated through an individual's open
carrying of a firearm in accordance with Michigan law.  Moreover, the "empty holster"
protest in *Smith* was part of a larger advocacy effort that clearly implicated the First
Amendment guarantee of free speech, as it included passing out leaflets and wearing T-
shirts with the logo of the SCCC organization.  Here, in contrast, Plaintiff's open carrying
of a gun was unaccompanied by any other means of conveying a message in support of
Michigan's open carry law.  Thus, the decision in *Smith* does not overcome the Defendant
officers' appeal to qualified immunity, and Plaintiff does not point to any other ruling that
would have alerted a reasonable officer in Defendants' position that Plaintiff was engaged
in expressive activity protected by the First Amendment.

23

Black that an individual was "possibly in possession of a handgun in a backpack")), and that this individual "was pacing back and forth," causing the caller to become "nervous that something else was going on," (*id.* at 4). This record does not tend to suggest that Plaintiff's alleged advocacy of Michigan's open carry law was understood as such by other visitors to the Secretary of State office. *See Baker,* 40 F. Supp.3d at 895 (noting that "[b]ased upon the numerous emergency calls" placed by "concerned citizens" who witnessed the plaintiffs walking down the street with pistols and long guns, the individuals who placed these calls evidently did not "perceiv[e] Plaintiffs as open carry activists demonstrating their First . . . Amendment rights," but instead "were simply alarmed and concerned for their safety and that of their community").

Finally, even assuming that there was evidentiary support for Plaintiff's assertion that his open carrying of a firearm constituted protected First Amendment activity, the record is bereft of evidence that the Defendant police officers retaliated against Plaintiff for his exercise of this protected activity. Officer Mills stated in his police report that upon approaching Plaintiff in the Secretary of State office, he "asked [Plaintiff] immediately just to step outside" in order to determine "what was going on," given the officer's uncertainty whether Plaintiff was alone and "what his intention was," as well as his "concern[] for the

24

safety of the other [people] inside" the office.  (Police Report at 4.)  Similarly,

Sergeant Gross reported that Plaintiff "immediately became upset and agitated"

upon being approached by Officer Mills, leading the sergeant to "believe that the

public's safety was of extreme concern at that moment and that there was a high

probability that the safety of these individuals, including employees, was in

jeopardy."  (*Id.* at 8.)[19]  Indeed, Plaintiff himself testified that after he was forcibly

removed from the Secretary of State office and "demanded to know why" the

officers had treated him in this fashion, Sergeant Gross advised him that the

officers were investigating a report of "a gun in a bag."  (Plaintiff's Dep. at 70.)

       This record would not permit the inference that the Defendant officers acted

in retaliation against Plaintiff's advocacy of Michigan's open carry law.  Instead,

the record indicates that the officers (i) were investigating a report of a handgun in

a backpack, rather than an exercise of open carry rights, and (ii) took action

against Plaintiff, including leading him outside the Secretary of State office and

then placing him under arrest, as a result of the officers' concerns for the safety of

others and their belief that Plaintiff was resisting their attempts to investigate his

---

       [19]As noted earlier, Plaintiff evidently did not depose any of the Defendant officers,
so the statements in their police reports concerning their motives for acting as they did
stand uncontradicted in the record.  This leaves Plaintiff facing an uphill evidentiary
battle in his effort to show that the Defendant officers retaliated against his exercise of
rights protected by the First Amendment.

activities and ascertain his intentions.  Given the lack of evidence that the

Defendant officers acted in retaliation against Plaintiff's exercise of his right of

free speech — or, indeed, that they even perceived Plaintiff as exercising such a

right — the officers are entitled to summary judgment in their favor on Plaintiff's

First Amendment claims of retaliatory seizure and arrest.

### 3.  Plaintiff's Claim of an Abridgment of His Second Amendment Right to Bear Arms

In count II of his complaint, Plaintiff alleges that when the Defendant police

officers "seize[d] Plaintiff's pistol without justification or provocation," they

thereby "violated his Second Amendment individual right to keep and bear arms."

(Complaint at ¶ 45.)  As discussed below, the Court finds that the Defendant

officers are entitled to qualified immunity from liability for this claimed violation,

where the posited Second Amendment right upon which this claim rests is not

clearly established.

In *District of Columbia v. Heller,* 554 U.S. 570, 635, 128 S. Ct. 2783, 2821-

22 (2008), the Supreme Court struck down on Second Amendment grounds a

District of Columbia law that banned handgun possession in the home and "also

require[d] that any lawful firearm in the home be disassembled or bound by a

trigger lock at all times, rendering it inoperable."  In so ruling, the Court found

that the law in question transgressed an interest that the Second Amendment "elevates above all other[s]" — namely, "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Heller,* 554 U.S. at 635, 128 S. Ct. at 2821. The Court emphasized, however, that "[l]ike most rights, the right secured by the Second Amendment is not unlimited," and that "[f]rom Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." 554 U.S. at 626, 128 S. Ct. at 2816. The Court noted, for example, that "the majority of 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues," and it cautioned that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings." 554 U.S. at 626, 128 S. Ct. at 2816-17.

As this summary makes clear, *Heller* does not address the circumstances presented here — namely, the possession of a firearm outside the home. "While the Supreme Court spoke of a right of law-abiding, responsible citizens to keep and bear arms in case of confrontation outside the context of an organized militia,

27

it did not say, and to date has not said, that *publicly* carrying a firearm unconnected to defense of hearth and home and unconnected to militia service is a definitive right of private citizens protected under the Second Amendment." *Powell v. Tompkins,* 783 F.3d 332, 348 (1st Cir. 2015); *see also Tyler v. Hillsdale County Sheriff's Department,* 775 F.3d 308, 316 (6th Cir. 2014) ("The Supreme Court has not fleshed out the extent of the right protected by the Second Amendment."), *opinion vacated and rehearing en banc granted* (April 21, 2015); *Peruta v. County of San Diego,* 742 F.3d 1144, 1150 (9th Cir. 2014) (finding it "obvious" that "neither *Heller* nor [the Supreme Court's subsequent decision in *McDonald v. City of Chicago,* 561 U.S. 742, 130 S. Ct. 3020 (2010)] speaks explicitly or precisely to the scope of the Second Amendment right outside the home or to what it takes to 'infringe' it"), *request for rehearing en banc granted,* 781 F.3d 1106 (9th Cir. 2015); *Moore v. Madigan,* 702 F.3d 933, 935 (7th Cir. 2012) ("[T]he Supreme Court has not yet addressed the question whether the Second Amendment creates a right of self-defense outside the home.").  Thus, although Plaintiff views certain language in *Heller* as supportive of the "assumption that the right to keep and bear arms extends beyond the home," (Plaintiff's Response Br. at 11), he does not (and cannot) assert that *Heller* by itself defines the contours of the Second Amendment right to keep and bear arms

28

with sufficient clarity that a reasonable police officer in Defendants' position

would have clearly understood that Plaintiff had a Second Amendment right to

openly carry a gun as he conducted his business at a Secretary of State office.

What is more, Plaintiff expressly acknowledges that "the Sixth Circuit Court

of Appeals has not yet spoken on the issue of the right to bear arms outside the

home since the *Heller* decision." (Plaintiffs' Response Br. at 12.) In recognition

of the Court of Appeals' silence on this subject, both the Sixth Circuit itself and a

number of district courts in this circuit have invoked the doctrine of qualified

immunity to dismiss Second Amendment claims similar to the one asserted by

Plaintiff here, reasoning that the Second Amendment rights posited by the

plaintiffs in these cases were not clearly established. *See Embody v. Ward,* 695

F.3d 577, 581 (6th Cir. 2012) (ruling that the defendant park ranger was entitled to

qualified immunity because "[n]o court has held that the Second Amendment

encompasses a right to bear arms within state parks"); *Deffert,* 111 F. Supp.3d at

812 (finding that "the right Plaintiff alleges Defendant violated — the right to bear

arms for the purpose of self-defense outside the home — was not 'clearly

established' under the Second Amendment in March 2013");[20] *Northrup,* 58 F.

_____

[20]Notably, Plaintiff's counsel here also represented the plaintiff in *Deffert.* The
incident giving rise to that case — the plaintiff's detention following a 911 call that a man
dressed in camouflage pants was walking along a public sidewalk in Grand Rapids,

Supp.3d at 849 (observing that "[n]either the parties nor my own research has

identified any case in which the Second Amendment was held to cover" the right

claimed in that case, an "individual's right to openly carry a handgun on a public

sidewalk"); *Baker v. Smiscik,* 49 F. Supp.3d 489, 500-01 (E.D. Mich. 2014)

(finding that the Second Amendment right claimed by the plaintiff to "openly

carry firearms in a private business establishment" was not "clearly established at

the time of his encounter with the [defendant police] officers"); *Baker,* 40 F.

Supp.3d at 894 (holding that "the right Plaintiffs say Defendants violated — the

right to bear arms for the purpose of self-defense outside the home — is not

clearly established under the Second Amendment").

Against this substantial weight of authority invoking the doctrine of

qualified immunity to dismiss § 1983 claims resting on a posited Second

Amendment right to openly carry a firearm outside the home, Plaintiff points to

decisions by other Courts of Appeals that recognize, or at least assume, that the

protection of the Second Amendment extends outside the home. *See Peruta,* 742

F.3d at 1166 (determining, in a case challenging the defendant county's policies

---

Michigan with a pistol in a holster strapped to his leg —occurred roughly two months
before the incident at issue here, and it appears that the plaintiff in *Deffert* asserted largely
the same federal and state-law claims that Plaintiff has brought in this case. *See Deffert,*
111 F. Supp.3d at 801-04.

for obtaining a license to carry a concealed weapon, that the Second Amendment right to bears arms "includes the right to carry an operable firearm outside the home for the lawful purpose of self-defense"); *Drake v. Filko,* 724 F.3d 426, 431 (3d Cir. 2013) (declining, for purposes of determining the constitutionality of a New Jersey law regulating the issuance of permits to carry handguns in public, to "definitively declare that the individual right to bears arms for the purpose of self-defense extends beyond the home," but nonetheless recognizing that this Second Amendment right "*may* have some application beyond the home"); *Woollard v. Gallagher,* 712 F.3d 865, 876 (4th Cir. 2013) (addressing a challenge to a Maryland handgun permitting scheme, and "assum[ing]" for the purposes of this analysis "that the *Heller* right exists outside the home"); *Moore,* 702 F.3d at 942 (opining that the Second Amendment right to bear arms for self-defense, as recognized by the Supreme Court in *Heller,* "is as important outside the home as inside," and thus declaring unconstitutional an Illinois statute that generally prohibited the carrying of guns in public); *Kachalsky v. County of Westchester,* 701 F.3d 81, 89 (2d Cir. 2012) (addressing a challenge to the State of New York's handgun licensing scheme, and "proceed[ing] on the assumption" that the Second Amendment right recognized in *Heller* "must have **some** application in the very different context of the public possession of firearms" (footnote omitted)); *Ezell v.*

31

*City of Chicago,* 651 F.3d 684, 708 (preliminarily enjoining a Chicago ordinance that banned all firing ranges in the city on the ground that it was a "serious encroachment on the right to maintain proficiency in firearm use," which in turn was "an important corollary to the meaningful exercise of the core right to possess firearms for self-defense"). These cases, in Plaintiff's view, undermine Defendants' suggestion in their motion that the right to bear arms outside the home remains "unsettled."

These decisions fall short in several respects, however, of demonstrating that the Second Amendment right claimed by Plaintiff here was clearly established at the time of the incident giving rise to this suit. First, these out-of-circuit rulings cannot serve as notice to the Defendant officers of the contours of the Second Amendment right to keep and bear arms in the Jackson, Michigan jurisdiction in which they are employed. *See Durham,* 97 F.3d at 866; *Baker,* 49 F. Supp.3d at 500. Moreover, while the absence of controlling precedent on this issue may be overcome by a "robust consensus of cases of persuasive authority," *al-Kidd,* 563 U.S. at ___, 131 S. Ct. at 2084 (internal quotation marks and citation omitted), Plaintiff has identified only two circuits, the Seventh and Ninth, that have expressly recognized a Second Amendment right to bear arms for self-defense that

extends beyond the home, *see Peruta,* 742 F.3d at 1166;[21] *Moore,* 702 F.3d at 942; *Ezell,* 651 F.3d at 708, while the remaining cases cited by Plaintiff merely assume without deciding that such a right exists, *see Drake,* 724 F.3d at 431; *Woollard,* 712 F.3d at 876; *Kachalsky,* 701 F.3d at 89.  Upon recently surveying this case law, the First Circuit aptly observed that "[d]ebate continues among [the] courts" as to whether the Second Amendment encompasses a right to "*publicly* carry[] a firearm unconnected to defense of hearth and home and unconnected to militia service." *Powell,* 783 F.3d at 348.  As the Supreme Court has emphasized, "[i]f judges thus disagree on a constitutional question, it is unfair to subject police to money damages for picking the losing side of the controversy." *Wilson v. Layne,* 526 U.S. 603, 618, 119 S. Ct. 1692, 1701 (1999).

Finally, even if the out-of-circuit decisions cited by Plaintiff could be viewed as reflecting some sort of emerging consensus that the Second Amendment right to bear arms extends outside the home, each of these cases addressed the constitutionality of a state or local gun regulation, and not the lawfulness of a

---

[21]As Defendants point out, the Ninth Circuit issued its *Peruta* decision in 2014, after the incident giving rise to Plaintiff's claims in this case, and this ruling therefore could not serve as notice of the state of the Second Amendment law at the time the Defendant officers took the actions challenged by Plaintiff.  In addition, the Ninth Circuit has vacated this decision upon granting a request for *en banc* rehearing.  *See Peruta v. County of San Diego,* 781 F.3d 1106 (9th Cir. 2015).

police officer's encounter with a private citizen who is openly carrying a gun outside the home.  Surely, then, any broader Second Amendment principles that might be gleaned from this case law concerning the constitutionality of gun regulations would not readily translate into clearly established law that governed the Defendant officers' specific interaction with Plaintiff.  Rather, this Court concludes, in accordance with the uniform weight of authority in cases decided within this circuit, that the Second Amendment right posited by Plaintiff here — *i.e.,* the right to openly carry a firearm outside the home — was not clearly established at the time of the incident giving rise to this suit.

### 4.    Plaintiff's Claims of Unlawful Detention and Arrest in Violation of the Fourth Amendment

In Plaintiff's third and final federal § 1983 claim, as set forth in count I of his complaint, he alleges that the Defendant police officers violated the Fourth Amendment protection against unreasonable seizures by (i) forcibly leading Plaintiff out of the Secretary of State office without reasonable suspicion that he was engaged in criminal activity, and then (ii) arresting him without probable cause following his removal from the office.  Defendants again argue that qualified immunity shields them from liability for these Fourth Amendment claims, contending (i) that the totality of the circumstances confronting them upon

34

their arrival at the Secretary of State office gave rise to reasonable suspicion that Plaintiff was engaged in criminal activity, and (ii) that Plaintiff's refusal to comply with the Defendant officers' lawful commands provided probable cause to arrest him for resisting a police officer. The Court agrees.

**(a)      Plaintiff's Claim of Unlawful Detention**

Turning first to the Defendant officers' initial interaction with Plaintiff upon their arrival at the Secretary of State office, Defendants concede that the officers did not have probable cause at that point to arrest Plaintiff for any criminal offense. Rather, Defendants look to the familiar principles of *Terry v. Ohio,* 392 U.S. 1, 88 S. Ct. 1868 (1968) and its progeny, under which a law enforcement officer may conduct a "temporary investigative stop" so long as he has "reasonable suspicion of criminal activity based on specific and articulable facts known to the officer at the time of the stop." *Embody,* 695 F.3d at 580 (internal quotation marks and citation omitted). The reasonable suspicion needed to warrant a *Terry* stop "requires more than just a mere hunch, but is satisfied by a likelihood of criminal activity less than probable cause, and falls considerably short of satisfying a preponderance of the evidence standard." *Smoak v. Hall,* 460 F.3d 768, 778 (6th Cir. 2006) (internal quotation marks and citation omitted). This Court must "examine the totality of the circumstances to determine whether reasonable

35

suspicion existed to justify a *Terry* stop" of Plaintiff in the Secretary of State office. *Smoak,* 460 F.3d at 779 (internal quotation marks and citation omitted).

The Court finds that the Defendant officers' initial encounter with Plaintiff was supported by reasonable suspicion of criminal activity. When Officer Mills first approached Plaintiff, he and the other Defendant officers had been informed by a police dispatcher that an individual with long hair in the Secretary of State office was "possibly in possession of a handgun in a backpack," that the mall in which this office was located was a "weapons-free zone," and that the individual who had triggered the call to the Jackson police department was "pacing back and forth" in the office, leading the caller to be "nervous that something else was going on." (Defendants' Motion, Ex. 3, Police Reports at 2, 4, 7.) Upon the officers' arrival at the Secretary of State office, they observed that there were roughly 50 or 60 people in the office, and they immediately identified Plaintiff as matching the description given by the dispatcher. (*See id.* at 3, 4.) In addition, when Officers Mills entered the office and approached Plaintiff, he noticed that Plaintiff was carrying a pistol in a holster on his right hip. (*See id.* at 4.)

Under the totality of these circumstances, then, the facts known to the Defendant officers indicated (i) that Plaintiff had entered a crowded Secretary of State office bearing a backpack with a handgun, (ii) that he was acting

36

suspiciously by pacing back and forth in the office, and (iii) that he was carrying a weapon on his person. The Court is satisfied that these circumstances gave rise to reasonable suspicion that Plaintiff was engaged in criminal activity, including (but not limited to) carrying a concealed weapon in a backpack. While Plaintiff makes much of the fact that he apparently was not carrying his backpack when the Defendant officers saw and approached him, (*see* Plaintiff's Response Br. at 8), this alone would not dispel the officers' reasonable suspicion of criminal activity, particularly where Plaintiff was reported as acting suspiciously. Indeed, Defendants point out that this incident occurred on the one-month anniversary of the Boston Marathon bombing, in which backpacks containing explosives had been left unattended and then detonated. Against this backdrop, it cannot be said that an unattended backpack would undermine a finding of reasonable suspicion, especially where the information available to the Defendant officers indicated that there was a gun in this unattended bag.

To be sure, Plaintiff correctly points out that it would not have been unlawful for him to carry a gun in his backpack, provided that he had a license to carry a concealed weapon. *See* Mich. Comp. Laws § 750.227(2).[22] In its recent

---

[22]As it turns out, Plaintiff had a license to carry a concealed weapon, and he produced it to Sergeant Gross after the Defendant officers removed him from the Secretary of State office. This after-the-fact discovery, however, does not defeat a

decision in *Northrup,* 785 F.3d 1128, the Sixth Circuit observed that state laws

authorizing the possession of firearms under certain circumstances — *e.g.,* laws

permitting the open carrying of guns or the carrying of concealed weapons with a

permit — may affect the Fourth Amendment calculus, since "[w]here it is lawful

to possess a firearm, unlawful possession is not the default status." 785 F.3d at

1132 (internal quotation marks and citations omitted).[23]  In Plaintiff's view, the

reasoning in *Northrup* defeats Defendants' claim of reasonable suspicion here,

since the Sixth Circuit's decision illustrates that the Defendant officers could not

have subjected Plaintiff to a *Terry* stop based on the mere "possibility" that he

might have lacked the necessary permit to lawfully carry a concealed weapon in

his backpack. *See Northrup,* 785 F.3d at 1132-33.  Rather, as the court explained

in that case, involving the detention and disarming of an individual who was

openly carrying a handgun in a holster on his hip as he walked down a public

---

finding of reasonable suspicion.  "[W]hether a detained suspect is later determined not to
have violated the law does not bear on whether the detaining officer had a reasonable
suspicion to justify detention while pursuing an investigation." *Baker,* 49 F. Supp.2d at
499 n.7; *see also Illinois v. Wardlow,* 528 U.S. 119, 126, 120 S. Ct. 673, 677 (2000)
(explaining that "*Terry* accepts the risk that officers may stop innocent people").

[23]At the time of the parties' initial summary judgment briefing in this case,
Defendants relied on the district court's decision in *Northrup,* but the Sixth Circuit had
not yet ruled on the appeal from this decision.  Following the Sixth Circuit's recent ruling
in *Northrup,* the parties were granted leave to file supplemental briefs addressing the
impact of this appellate decision on Defendants' present motion, and the Court has
reviewed and considered these supplemental briefs in resolving Defendants' motion.

sidewalk:

> While open-carry laws may put police officers . . . in awkward situations from time to time, the Ohio legislature has decided its citizens may be entrusted with firearms on public streets.  The Toledo Police Department has not authority to disregard this decision — not to mention the protections of the Fourth Amendment — by detaining every 'gunman' who lawfully possesses a firearm.  And it has long been clearly established that an officer needs evidence of criminality or dangerousness before he may detain and disarm a law-abiding citizen.  We thus affirm the district court's conclusion that, after reading the factual inferences in the record in [the plaintiff's] favor, [the defendant officer] could not reasonably suspect that [the plaintiff] needed to be disarmed.

785 F.3d at 1133 (citations omitted).

The Court agrees with Defendants that *Northrup* is distinguishable here.  In that case, the claim of reasonable suspicion for a *Terry* stop rested on two facts alone:  (i) the plaintiff's open possession of a firearm, and (ii) a 911 call reporting a "guy walking down the street" who was "carrying a gun out in the open." *Northrup,* 785 F.3d at 1130-31.[24]  Here, in contrast, the Defendant officers were dispatched to a crowded Secretary of State office to investigate a report of an individual with a gun in a backpack who was acting suspiciously by pacing back and forth in the office, and the officers learned in addition upon their arrival at the

---

[24]Notably, the police dispatcher who received the 911 call informed the caller that it was legal for the plaintiff to openly carry a handgun so long as he had a permit to carry a concealed weapon.  785 F.3d at 1130.  The caller had a "change of heart" in light of this information, but "the dispatcher sent an officer to the scene anyway."  785 F.3d at 1130.

office that Plaintiff was carrying a gun in a holster on his hip. Under analogous circumstances, both the Court of Appeals and other district courts in this circuit have found that a *Terry* stop was warranted for further investigation of possible criminal activity. *See Embody,* 696 F.3d at 580-81 (finding that although the plaintiff had a permit that allowed him to carry a handgun in a state park, the defendant park ranger nonetheless had "ample reason for suspicion that [the plaintiff] possessed an illegal firearm," where the barrel of the plaintiff's weapon was just "a half-inch shy of the legal limit" and thus "reasonably could look more like a rifle than a handgun," leading other park visitors to be "frightened at the sight of a man in camouflage carrying an AK-47 across his chest," and where the plaintiff "had painted the barrel tip of the gun orange," raising a reasonable suspicion that the plaintiff was trying to make his gun look like a toy in order to "disguise an illegal weapon"); *Deffert,* 111 F. Supp.3d at 809-10 (finding that the defendant officer had reasonable suspicion to conduct a *Terry* stop of the plaintiff, based on the plaintiff's open carrying of a gun down a public sidewalk while "wearing camouflage pants" and "singing 'Hakuna Matata' loudly enough to be heard from a police cruiser," all of which was "sufficiently alarming to a resident to call 911" and led the defendant officer to suspect that the plaintiff "may have had mental issues and was about to commit a violent crime" (internal quotation

40

marks and citation omitted)); *Baker,* 49 F. Supp.3d at 498 (holding that "[t]he

unusual display of multiple firearms" by the plaintiff, "coupled with a 911 call

seeking assistance in removing [the plaintiff] from" the donut shop he had entered,

"support a reasonable suspicion that [the plaintiff] might be engaged in a criminal

trespass of the premises or endangering other customers" (footnote and citation

omitted)); *Baker,* 40 F. Supp.3d at 884-85, 891 (concluding that there was

reasonable suspicion for a *Terry* stop of the two plaintiffs, who had triggered a

"flood of 911 calls from concerned citizens" by walking down a public sidewalk

"while carrying pistols in holsters and long guns slung over their shoulders," and

who responded "elusively (if not defiantly)" to the defendant police officers'

initial inquiries about what they were doing, where "[r]easonable officers may well

have been concerned" under these circumstances about "what [the plaintiffs]

would do next").

In light of this case law, even if it could be said that *Northrup* represents the

closest fit to the facts presented here — a premise which, as explained above, the

Court does not accept — the doctrine of qualified immunity would protect the

Defendant police officers from any arguably mistaken judgment that they had

reasonable grounds to suspect Plaintiff of engaging in criminal activity.  First, of

course, *Northrup* was decided two years after the incident giving rise to this suit,

41

and thus could not serve as notice to the Defendant officers that their actions might be unlawful. Moreover, the Court reads *Northrup* as establishing that public gun possession alone does not give rise to reasonable suspicion that this possession by itself might be unlawful, particularly in light of state laws that authorize the open carrying of a firearm. Yet, this does not call into question the case law — including the Sixth Circuit's own prior decision in *Embody* — holding that the circumstances surrounding an individual's public possession of a firearm can give rise to reasonable suspicion that this possession might be unlawful or that other criminal activity might be afoot. As explained, the Court finds that such surrounding circumstances were present here — or, at a minimum, that a reasonable person in the position of the Defendant officers would have believed that a *Terry* stop was warranted to investigate the lawfulness of Plaintiff's activities.

Nonetheless, Plaintiff insists that the Defendant officers exceeded the scope of a permissible *Terry* stop when they forcibly removed him from the Secretary of State office after he refused the officers' request to leave voluntarily.[25] As the

_____

[25]As a threshold matter, Plaintiff questions whether the Defendant officers were even engaged in a *Terry* stop at the time they removed him from the office. As both he and Defendants agree, the officers did not even need reasonable suspicion in order to approach Plaintiff and ask him questions. *See Northrup,* 785 F.3d at 1131; *O'Malley v. City of Flint,* 652 F.3d 662, 668 (6th Cir. 2011) (confirming that "[t]he Fourth

Sixth Circuit has explained, the existence of reasonable suspicion is "only one aspect" of the *Terry* inquiry, and a court must also consider the manner in which the *Terry* stop is conducted. *Smoak,* 460 F.3d at 779.  In particular, the "scope of activities during an investigatory stop must reasonably be related to the circumstances that initially justified the stop," and this inquiry entails consideration of "the length of the detention, the manner in which it is conducted, and the degree of force used" in the course of the stop.  460 F.3d at 779, 781 (internal quotation marks and citation omitted).  "If the manner in which an

_____

Amendment does not apply to consensual encounters with the police").  Because the Defendant officers merely ***requested*** that Plaintiff step outside the Secretary of State office, and did not ***order*** him to do so, Plaintiff reasons that he was free to refuse this request (as he did) and go about his business, and he argues that the Defendant officers improperly "escalated the contact" at this point, even though he had done nothing more than appropriately decline the officers' request and bring the consensual encounter to an end.  (Plaintiff's Response Br. at 10.)

The logic of this argument is flawed.  Even if the Defendant officers' conduct upon initially approaching Plaintiff was consistent with a consensual encounter, this does not mean that the officers necessarily were limited to the scope of a consensual encounter in their subsequent dealings with Plaintiff.  Rather, the officers could have hoped to secure Plaintiff's cooperation through a wholly consensual approach, but then shifted to more *Terry*-like investigative measures once this cooperation was not forthcoming.  So long as the Defendant officers had a reasonable suspicion of criminal activity when they initially approached Plaintiff, they were free to employ the investigative techniques of a consensual encounter or a *Terry* stop as they saw fit, and their initial choice of the former approach did not foreclose the option to move to the latter as warranted by circumstances.  A citizen/officer encounter need not be pigeonholed, labeled, and analyzed solely by reference to how the encounter is initiated, nor is it legally relevant to the question before the Court that Plaintiff might have perceived this encounter as consensual in nature.

43

investigatory stop is conducted is unreasonable, the seizure then ripens into an arrest, which must be supported by probable cause." 460 F.3d at 779. In Plaintiffs' view, the Defendant officers violated these standards governing a *Terry* stop by grabbing his arms and escorting him from the Secretary of State office after he declined to leave the premises voluntarily.

The Court finds that the Defendant officers' limited use of force in their initial encounter with Plaintiff did not exceed the scope of a lawful *Terry* stop. "It is well recognized that the right to make an . . . investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Dorsey v. Barber,* 517 F.3d 389, 399 (6th Cir. 2008) (internal quotation marks and citation omitted). In recognition of this principle, the Sixth Circuit has found in a number of cases that the use of some degree of force was consistent with a *Terry* stop. *See, e.g., Embody,* 695 F.3d at 581 (holding that "[o]rdering [the plaintiff] to the ground at gun point was not an excessive intrusion given the existence of a loaded weapon, the risk to officer (or public) safety if [the plaintiff] had been up to no good and the danger to law enforcement whenever it disarms an individual suspected of crime"); *O'Malley,* 652 F.3d at 670-71 (finding that the plaintiff was appropriately handcuffed and detained, where it was "not disputed that [the plaintiff] told [the defendant police officer] that he had a gun in his

44

vehicle, was angry, raised his voice, turned his back and lifted his shirt, and called [the defendant officer's] inquiry 'bulls–t'"); *United States v. Atchley,* 474 F.3d 840, 849 (6th Cir. 2007) (citing the defendant's "nervous behavior" as a factor that supported placing him in handcuffs "as a safety precaution"); *Radvansky v. City of Olmsted Falls,* 395 F.3d 291, 309 (6th Cir. 2005) (determining that the defendant police officers were "justified in drawing their weapons and using handcuffs to restrain" the plaintiff, where they were "responding to a call that a burglary was in progress" and the plaintiff had informed them that "he was armed with a stun gun"); *Houston v. Clark County Sheriff Deputy John Does 1-5,* 174 F.3d 809, 814-15 (6th Cir. 1999) (stating that when police officers "reasonably fear that suspects are armed and dangerous," they may take such measures as "order[ing] the suspects out of a car," "draw[ing] their weapons," and handcuffing the suspects as "reasonably necessary to protect the officers' safety during the[ir] investigation"). In addition, Defendants point more specifically to a Second Circuit decision in which the court deemed it "well established that officers may ask (or force) a suspect to move as part of a lawful *Terry* stop." *United States v. Gori,* 230 F.3d 44, 56 (2d Cir. 2000) (collecting cases from a number of circuits).

This case law amply supports the degree of force used by the Defendant officers here in conducting a *Terry* stop and investigating their reasonable

suspicions of unlawful activity.  As they approached Plaintiff, the officers had

been told that this individual had brought a backpack with a gun into the Secretary

of State office and had been pacing nervously back and forth in the office, and

they could see for themselves that Plaintiff was carrying a firearm in a holster on

his hip.  Under these circumstances, where Plaintiff was armed and there was

reason to suspect he had engaged in criminal activity, the Defendant officers

reasonably could have wished to avoid publicly questioning Plaintiff in a busy

government office while surrounded by 50 or more people, including women and

children.  Indeed, the officers' anticipation of, and desire to prevent, a public and

potentially dangerous confrontation before a crowd of innocent bystanders was

seemingly vindicated when Plaintiff rebuffed the officers' initial, and admittedly

"polite[]," (*see* Plaintiff's Response Br. at 9), request that he voluntarily

accompany them out of the office.  Accordingly, the Defendant officers were

entitled to use some degree of force to ensure that they could conduct their

investigation in a more safe location outside the Secretary of State office, and the

record indicates that the officers used no more force than was reasonably

necessary to achieve this purpose.  In addition, given Plaintiff's concession that he

tensed his arms and struggled with the Defendant officers as they led him out of

the office, (*see* Plaintiff's Dep. at 67), and given the inherent risk of danger, to

both the officers and the public, posed by a *Terry* stop of an armed individual, the officers acted reasonably in seizing Plaintiff's pistol as they struggled to remove him to a location where they could more safely investigate his activities.[26]

### (b)     Plaintiff's Claim of Unlawful Arrest Without Probable Cause

Having resolved Plaintiff's claim of unlawful detention in violation of the Fourth Amendment, the Court turns to the question whether the Defendant officers had a lawful basis for arresting Plaintiff after they had removed him from the Secretary of State office and concluded their investigation of his activities. Under core Fourth Amendment principles, the government's seizure of a person must be "reasonable," U.S. Const. amend. IV, and a seizure that rises to the level of an arrest must be supported by probable cause. *See Kaupp v. Texas,* 538 U.S. 626, 630, 123 S. Ct. 1843, 1846 (2003); *Michigan v. DeFillippo,* 443 U.S. 31, 36-37, 99 S. Ct. 2627, 2631-32 (1979). The Supreme Court "repeatedly has explained that 'probable cause' to justify an arrest means facts and circumstances within the

---

[26]At a minimum, the Court finds that qualified immunity shields the Defendant officers from liability for the force they used during their *Terry* stop of Plaintiff. Apart from the above-cited case law, in which courts in this circuit and elsewhere approved the use of analogous types and degrees of force under circumstances similar to those presented here, it is noteworthy that Plaintiff has cited no case whatsoever that could have alerted the Defendant officers to the unlawfulness of their actions. As it is Plaintiff's burden to show that the Defendant officers are not entitled to qualified immunity, *see Sheets,* 287 F.3d at 586, the Court readily concludes that Plaintiff has not met this burden.

47

officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *DeFillippo,* 443 U.S. at 37, 99 S. Ct. at 2632. Moreover, "[w]hether an officer is authorized to make an arrest ordinarily depends, in the first instance, on state law." 443 U.S. at 36, 99 S. Ct. at 2631.

In this case, the Defendant officers' investigation dispelled their suspicion that Plaintiff might have unlawfully possessed a firearm, since Plaintiff eventually produced his license to carry a concealed weapon and there is no evidence, in any event, that a gun was found in his backpack. Nonetheless, the Defendant officers arrested Plaintiff for resisting an officer in violation of a City of Jackson ordinance.[27]  The question, then, is whether the facts and circumstances within the

---

[27]The pertinent Jackson ordinance provided at the time that "[n]o person shall willfully and knowingly hinder, oppose, obstruct or resist any law enforcement officer or official or employee of the city in performing his duties as such." City of Jackson Ordinances § 18-31, *available at* https://www.municode.com/library/mi/jackson/codes/code_of_ordinances?nodeId=PTIIC OOR_CH18OF_ARTIIOFAFGOFU&codeArchiveDate=2014-12-23.

Similarly, Defendants point to a Michigan statute that prohibits an individual from, among other things, "obstruct[ing] . . . a person who the individual knows or has reason to know is performing his or her duties." Mich. Comp. Laws § 750.81d(1). This same statute confirms that a "person" includes "[a] police officer of this state or a political subdivision of this state," and it defines "obstruct[ion]" as "the use or threatened use of physical interference or force or a knowing failure to comply with a lawful command." Mich. Comp. Law §§ 750.81d(7)(a), 750.81d(7)(b)(i).

knowledge of the Defendant officers established probable cause to believe that Plaintiff had violated this ordinance.

The Court finds that Plaintiff's arrest was supported by probable cause. When the Defendant officers first approached Plaintiff to investigate reports that an individual at the Secretary of State office had a gun in a backpack and was behaving suspiciously, they asked Plaintiff to step outside the office so that the officers could continue their inquiry into this armed individual's activities away from the 50-plus other people in the office at the time. (*See* Defendants' Motion, Ex. 3, Police Report at 4.) Plaintiff, however, refused this request, and instead offered that he was willing to speak with the officers inside the Secretary of State office. (Plaintiff's Dep. at 60.) The officers repeated their request that Plaintiff accompany them out of the office, but Plaintiff refused each such request, acknowledging that he generally was non-compliant with the officers' appeals and that it was "possible" that he raised his voice during this interaction. (*Id.* at 61-63, 75.) In response, Sergeant Gross and Officer Mills each grabbed one of Plaintiff's arms and they forcibly removed him from the Secretary of State office, with Plaintiff testifying that he tensed up his arms and struggled with the officers as

they led him from the building.  (*Id.* at 67.)[28]  This lack of cooperation continued outside the office, with Plaintiff (i) "ignor[ing]" repeated requests for identification and instead "demand[ing] to know why I was assaulted, why I was attacked," (ii) "remind[ing] [Sergeant] Gross that there was no need for me to identify myself or to disclose that I was carrying a pistol because I was not carrying it concealed," and (iii) advising the Defendant officers that if a caller to the police had reported that he had a gun in his backpack, this individual was "guilty of a felony" for providing "false information."  (Plaintiff's Dep. at 69-71.)

Under comparable circumstances, the Sixth Circuit and courts in this District have found that there was probable cause, under either Michigan law or a municipal ordinance, to arrest an individual who obstructed a police officer's investigation of the circumstances giving rise to a *Terry* stop.  In *King v. Ambs,* 519 F.3d 607, 611 (6th Cir. 2007), for example, the plaintiff "was arrested after repeatedly interrupting an officer who was questioning a third party."  Because the plaintiff's "speech interrupted [the defendant officer] in a way that made it difficult, if not impossible, to conduct actual questioning," the court held that there was probable cause to arrest the plaintiff for violating a "disorderly conduct"

---

[28]The officers, for their part, stated in their reports that as they escorted Plaintiff from the office, he tensed up, pulled away, and protested in a loud voice that the officers had no right to do what they were doing.  (*See* Police Report at 3, 5, 8.)

ordinance that is materially indistinguishable from the Jackson ordinance cited by
Defendants here. *King,* 519 F.3d at 610, 612. Similarly, in *Devoe v. Rebant,* No.
05-71863, 2006 WL 334297, at *1-2, *4 (E.D. Mich. Feb. 13, 2006), the court
found that there was probable cause to arrest the plaintiff for hindering and
obstructing a police officer in violation of Michigan law and a local ordinance,
where the plaintiff refused to comply with several requests for identification and
then resisted the defendant officers' attempts to place him in the rear seat of a
police car.

Indeed, the case law lends support to the proposition that a refusal to
comply with a police officer's request for identification, without more, may
provide probable cause to arrest the non-compliant individual for resisting and
obstructing a police officer in the performance of his duties. In *Risbridger v.
Connelly,* 275 F.3d 565, 567-68 (6th Cir. 2002), for instance, witnesses identified
the plaintiff as having been involved in a fight in an alley, and the defendant
police officer arrested the plaintiff and charged him with violating a municipal
disorderly conduct ordinance after he refused repeated requests to produce his
identification.[29]  The Sixth Circuit held that the defendant officer was entitled to

---

[29]Again, the East Lansing ordinance at issue in *Risbridger,* 275 F.3d at 568, does
not differ in any material respect from the Jackson ordinance under which Plaintiff was
arrested.

qualified immunity, observing that when this officer "approached plaintiff based on at least reasonable suspicion that an assault had occurred and that plaintiff was involved, he had probable cause to believe plaintiff was hindering or obstructing an officer in the discharge of his duties by refusing to identify himself."

*Risbridger,* 275 F.3d at 569 (footnote omitted).[30]

---

[30]The issue of probable cause was largely undisputed in *Risbridger.* Instead, the principal question before the court was whether the plaintiff's Fourth Amendment rights were violated when he was "subject[ed] . . . to criminal sanctions for refusing to provide identification during a valid *Terry* stop." 275 F.3d at 570. The court declined to decide this issue, and instead found, in light of "the Supreme Court's express reservation of th[is] question" at the time, "as well as the lack of clear precedent from our circuit," that the defendant officer was entitled to qualified immunity with respect to this claimed Fourth Amendment violation. 275 F.3d at 572.

Shortly after *Risbridger* was decided, this same Fourth Amendment issue was raised before this Court in *Marrs v. Tuckey,* 362 F. Supp.2d 927, 935-38 (E.D. Mich. 2005). In the meantime, however, the Supreme Court had ruled in *Hiibel v. Sixth Judicial District Court,* 542 U.S. 177, 188, 124 S. Ct. 2451, 2459 (2004), that "[a] state law requiring a suspect to disclose his name in the course of a valid *Terry* stop is consistent with Fourth Amendment prohibitions against unreasonable searches and seizures." In light of *Hiibel,* this Court concluded that the plaintiff in *Marrs* could not "claim any Fourth Amendment protection against the Defendant state troopers' requests that she identify herself during the course of their initial, limited investigative detention of her." *Marrs,* 362 F. Supp.2d at 937 (footnote omitted). Nonetheless, the Court denied the defendant state troopers' request for qualified immunity as to the plaintiff's claim that the troopers lacked probable cause to arrest her for refusing repeated requests for identification, where the Michigan "resisting and obstructing" statute cited in support of this arrest, Mich. Comp. Laws § 750.479, had been construed at the time as requiring actual or threatened physical interference with a police officer's performance of his duties, and where the facts of that case indicated that the plaintiff had only passively resisted the defendant troopers' requests that she identify herself. *See Marrs,* 362 F. Supp.2d at 938-42. As observed in *Devoe,* 2006 WL 334297, at *4 & n.6, this aspect of *Marrs* has been superseded by an amendment to the Michigan "resisting and obstructing" statute, which now expressly provides that the statutory term "obstruct" encompasses

More recently, in *Combs v. City of Birmingham,* No. 12-14528, 2013 WL
4670699, at *1, *9 (E.D. Mich. Aug. 30, 2013), a court in this District held that an
arrest for resisting a police officer was supported by probable cause, where the
youthful-looking plaintiff was openly carrying a loaded assault rifle as he
"stroll[ed] the streets of downtown Birmingham," Michigan, but he "repeatedly
refused the [defendant] police officers' request for identification to verify he was
at least 18," and thus old enough to possess a firearm without adult supervision.
In so ruling, the court viewed the Supreme Court's decision in *Hiibel* as
"reaffirm[ing]" the principle recognized in *Terry* that "demanding and obtaining
certain identifying information from a suspect may be a critical and legitimate
component [of] a *Terry* stop." *Combs,* 2013 WL 4670699, at *9.  Because the
defendant police officers' requests for identification "were reasonably related to
the circumstances justifying [the] legal *Terry* stop" of the plaintiff, the court found
that the plaintiff's refusal to comply with these requests gave rise to probable
cause to arrest him for resisting and obstructing a police officer.  2013 WL
4670699, at *9.

These cases confirm that Plaintiff's conduct here rose to the level of

---

***both*** "the use or threatened use of physical interference or force" ***and*** "a knowing failure
to comply with a lawful command," Mich. Comp. Laws § 750.479(8)(a).

resisting or obstructing the Defendant officers as they sought to investigate a report that someone in the Secretary of State office had a gun in a backpack and was acting suspiciously.  As discussed earlier, the facts known to the Defendant officers upon their arrival at the Secretary of State office gave rise to reasonable suspicion that Plaintiff was engaged in criminal activity.  In addition, the Court has already determined that the officers acted within the scope of a reasonable investigation into these suspicions of criminal conduct when they approached Plaintiff, asked him to accompany them out of the office, and then forcibly removed him from the office after he refused to leave the premises voluntarily.  In this initial encounter with the Defendant officers, Plaintiff refused the officers' requests that he accompany them out of the Secretary of State office, and he concedes that he put up at least some resistance as the officers escorted him out of the building.  This obstructive conduct then continued upon Plaintiff's removal from the office, as he refused requests for his identification, insisted that he had no obligation to either identify himself or produce a license to carry a concealed weapon, and demanded to know why the officers had "assaulted" and "attacked" him.  These activities plainly impeded the Defendant officers as they exercised their authority under *Terry* to investigate their reasonable suspicions of criminal activity, and it follows that Plaintiff's actions provided probable cause to arrest

54

him for violating the City of Jackson's "resisting and obstructing" ordinance.

Plaintiff's sole effort to avoid this conclusion is not persuasive.  In his view, the Defendant officers "had only engaged Plaintiff in a consensual encounter" at the time they approached him and asked him to step outside the Secretary of State office, and he thus acted within his rights by "stat[ing] that he would prefer to [remain] where he was."  (Plaintiff's Response Br. at 10.)  As discussed earlier, however, Plaintiff's perception that he and the officers were engaged in a "consensual encounter" does not operate to limit the authority of the Defendant officers to take the measures appropriate to a *Terry* stop, so long as the officers had the requisite reasonable suspicion of criminal activity that would warrant these measures.  The mere fact that the Defendant officers might have preferred to obtain Plaintiff's voluntary compliance with their investigative efforts did not preclude them from securing this compliance through more coercive means that, as explained earlier, nonetheless remained consistent with a lawful *Terry* stop.

Alternatively, even if the Court were to conclude that the Defendant officers lacked probable cause to arrest Plaintiff, Plaintiff's Fourth Amendment claim arising from this arrest would nonetheless be defeated by qualified immunity.  As discussed, the facts of this case are similar to those presented in a number of prior decisions, including two published Sixth Circuit precedents, holding that there

55

was probable cause to arrest the plaintiffs in those cases for resisting and obstructing a police officer in violation of a Michigan statute or local ordinance. Against this backdrop of case law that tends to confirm the lawfulness of the actions taken by the Defendant police officers in this case, Plaintiff has utterly failed to identify any decision whatsoever, whether in this circuit or elsewhere, that might serve as notice to the Defendant officers that their arrest of Plaintiff would violate his rights under the Fourth Amendment.  It readily follows once again, then, that Plaintiff has not met his burden to show that the Defendant officers are not entitled to qualified immunity.

**C.    Defendants Are Entitled to an Award of Summary Judgment in Their Favor on Plaintiff's State-Law Claims of Assault and Battery, False Imprisonment, and Replevin.**

In counts IV, V, and VII of his complaint, Plaintiff has asserted state-law claims of assault and battery, false imprisonment, and replevin.  The Court need not address these claims at any length, because Plaintiff's perfunctory discussion of these claims in his response to Defendants' pending motion fails to provide any basis for denying Defendants' request for summary judgment in their favor as to each of these claims.

Turning first to Plaintiff's claim of assault and battery, the Defendant officers' challenge to this claim rests in part on an appeal to the immunity

conferred upon governmental employees under Michigan law.  In particular, under

Michigan's Governmental Tort Liability Act ("GTLA") as construed by the

Michigan Supreme Court, the individual Defendant police officers are immune

from liability for the state-law intentional tort claims asserted in Plaintiff's

complaint if — among other elements that are not at issue here — their actions

"were undertaken in good faith, or were not undertaken with malice." *Odom v.*

*Wayne County,* 482 Mich. 459, 480, 760 N.W.2d 217, 228 (2008).[31]  In contrast to

the objective standard of reasonableness that governs a qualified immunity inquiry

under § 1983, the good faith standard under Michigan's governmental immunity

law is "subjective, not objective." *Romo v. Largen,* 723 F.3d 670, 677 (6th Cir.

2013); *see also Cohn v. DeWeese,* No. 09-12187, 2010 WL 3906227, at *21 (E.D.

Mich. Sept. 30, 2010).  Nonetheless, both the Sixth Circuit and this Court have

recognized that "[t]he question of an officer's good faith under Michigan law

overlaps considerably, if not entirely, with [the federal qualified immunity]

---

[31]A different provision of Michigan's GTLA immunizes the Defendant City of
Jackson from tort liability so long as it was "engaged in the exercise or discharge of a
governmental function."  Mich. Comp. Laws § 691.1407(1).  In their present motion,
Defendants argue that the individual Defendant police officers were engaged in a
governmental function as they investigated a report of criminal activity, and Plaintiff does
not contend otherwise (or even address this question) in his response to Defendants'
motion.  Accordingly, Plaintiff's state-law tort claims against the Defendant City are
barred by governmental immunity.

analysis of whether the officer's actions were objectively reasonable under the circumstances." *Malory v. Whiting,* No. 11-1468, 489 F. App'x 78, 86 (6th Cir. July 13, 2012); *see also Cohn,* 2010 WL 3906227 at *21-22.

Against this backdrop, the Court's earlier analysis of Plaintiff's Fourth Amendment claims applies with equal force to Plaintiff's state-law claim of assault and battery. As previously explained, the force used by the Defendant officers to remove Plaintiff from the Secretary of State office was within the reasonable scope of the coercive measures that are permissible under federal law when carrying out a *Terry* stop and investigating reasonable suspicions of criminal activity. In addition, the Court has determined that Plaintiff's arrest was supported by probable cause, and Plaintiff does not point to evidence of actions taken by the Defendant officers in the course of this arrest that could possibly be characterized as undertaken with malice.

Indeed, in his response to Defendants' motion, Plaintiff evidently acknowledges that his state-law claim of assault and battery rises or falls with his federal Fourth Amendment claims. Specifically, Plaintiff states that he is content to "rely on his argument . . . on his Fourth Amendment claim" to demonstrate "the unreasonableness of [the] Defendant Officers' use of force." (Plaintiff's Response Br. at 16-17.) Even assuming that this "argument" is not so perfunctory as to

58

reflect the abandonment of Plaintiff's state-law claim of assault and battery, *see Dillery v. City of Sandusky,* 398 F.3d 562, 569 (6th Cir. 2005), the Court has already upheld, as a matter of Fourth Amendment law, the reasonableness of the Defendant officers' use of force in securing Plaintiff's compliance with their directive that he step outside the Secretary of State office so that the officers could more safely and effectively pursue their investigation into Plaintiff's suspected criminal activity. It follows under this same reasoning that Plaintiff has failed to produce evidence of actions undertaken with malice by any of the Defendant officers as they investigated Plaintiff's activities and placed him under arrest.

Next, Defendants correctly observe that "[i]n order to prevail on a claim of false arrest or false imprisonment" under Michigan law, Plaintiff "must show that [his] arrest was not legal, i.e., that it was made without probable cause." *Tope v. Howe,* 179 Mich. App. 91, 445 N.W.2d 452, 459 (1989). In light of the Court's conclusion that the Defendant officers had probable cause to arrest Plaintiff for resisting and obstructing a police officer in violation of a City of Jackson ordinance, Plaintiff cannot sustain his state-law claim of false imprisonment arising from this arrest.

Turning, finally, to Plaintiff's state-law claim of replevin, Defendants observe without dispute that the individual Defendant police officers are not in

possession of Plaintiff's firearm, and thus cannot be held liable under a state-law theory through which Plaintiff seeks the return of this firearm.  As for the Defendant City, to the extent that it is not immune from liability for its engagement in the governmental function of law enforcement when it allegedly came into possession of Plaintiff's gun, Defendants point to Plaintiff's admission at his deposition that he has never requested that this weapon be returned to him. (*See* Plaintiff's Dep. at 92.)  The Michigan Supreme Court has held that a "demand for . . . surrender" of the property at issue "is a prerequisite to an action in replevin."  *Myers v. Sawvel,* 219 Mich. 252, 189 N.W. 88, 89 (1922).

## IV.  <u>CONCLUSION</u>

For the reasons set forth above,

NOW, THEREFORE, IT IS HEREBY ORDERED that Defendants' December 1, 2014 motion for summary judgment (docket #12) is GRANTED.

s/Gerald E. Rosen
United States District Judge

Dated:  March 21, 2016

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on March 21, 2016, by electronic and/or ordinary mail.

s/Julie Owens
Case Manager, (313) 234-5135